IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | |
|---|---|
| JULIA VILLARREAL GONZALES,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant, | CASE NO. 3:21-CV-00093-CEH<br><br>CARMEN E. HENDERSON<br>UNITED STATES MAGISTRATE JUDGE<br><br>**MEMORANDUM OF OPINION & ORDER** |

**I. Introduction**

Plaintiff, Julia Villarreal Gonzales ("Gonzales" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 21). For the reasons set forth below, the Court REVERSES the Commissioner of Social Security's nondisability finding and REMANDS this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**II. Procedural History**

On October 3, 2018, Claimant filed applications for a period of disability, DIB, and SSI, alleging a disability onset date of September 1, 2017. The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). On November 7, 2019, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 13, PageID #: 116-158). On

1

November 27, 2019, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 13, PageID #: 93-115). The ALJ's decision became final on November 12, 2020, when the Appeals Council declined further review. (ECF No. 13, PageID #: 81-87).

On January 13, 2021, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 15, 16-1, and 17). Claimant asserts the following issues for review:

> 1. The ALJ's RFC determination at Step Four is unsupported by substantial evidence as she relied on the stale opinions of the State Agency medical consultants and inserted his [sic] own lay medical opinion.
>
> 2. The ALJ's determination at Step Three that Plaintiff did not meet or medically equal Listing 1.02 is unsupported by substantial evidence as the ALJ did not evaluate the Listing.
>
> 3. Plaintiff's disability determination was governed by an agency structure that violates the President's constitutional power to appoint and remove executive officers.

(ECF No. 15 at 3).

**III. Background**

    **A. Relevant Hearing Testimony**

The ALJ summarized the Claimant's symptom testimony:

In the initial application and at the hearing, the claimant alleged that she was unable to work due to pain in the bilateral knees, a history of right knee surgery, and shoulder pains secondary to osteoarthritis. Furthermore, in the adult disability and function reports, the claimant stated that she suffers from obesity and indicated that she has difficulties with tolerating pain and medications. Additionally, the claimant reported that her impairments make it difficult for her to do basic chores and activities that require lifting, squatting, bending, standing, reaching, walking, kneeling, and climbing stairs. The claimant also reported undergoing surgery for right rotator cuff repair, right total knee replacement, and left knee surgery. Continuing, the claimant reported that he [sic] requires the use of a cane for ambulation and indicated that without the cane, she loses balance. Moreover, the claimant testified at the hearing that she stopped working due to back pain and leg give way. The claimant also testified that she could only walk

approximately 30 minutes before needing to lay down, sit for 30 minutes, and lift and/or carry less than 8 pounds. (Ex. 2E, 4E, 6E, 7E, 10E, and Testimony).

(ECF No. 13, PageID #: 101).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

she was evaluated at the Promedica St. Luke's Hospital in September 2017 due to complaints of left shoulder, bilateral knee and left hip pains. (Ex. 7F, p. 4). During the subsequent clinical interview and physical examination, she was noted to have complaints of diffuse pain over the bilateral knees, as well as some pain in the left shoulder and left hip that has been gradually worsening. (Id., p. 4). Furthermore, her physical examination showed that she had limitations in left shoulder range of motion. (Id., p. 5). Additionally, the physical examination showed that she had limited range of motion in the left hip secondary to pain. However, the examination also showed that she had normal motor strength in the bilateral upper extremities, as well as normal sensations. (Id., p. 7). The examination also showed that the claimant maintained normal motor strength in the bilateral lower extremities, as well as normal sensations. The treatment notes also show that she had no evidence of cyanosis, edema, warmth, or swelling in the bilateral upper or lower extremities. (Id., p. 7). For treatment, she was placed on Naproxen and Ultram, and was recommended to follow up at Westside Orthopedic for a comprehensive orthopedic examination. (Id., p. 7-8).

Following the assessment at the hospital, the record reflects that the claimant was evaluated at Westside Orthopedic by Benjamin J. Salpietro, M.D., as part of her continuum of care. (Ex. 8F, p. 25). Upon examination, Dr. Salpietro assessed the claimant with a history of patellofemoral arthritis, with a history of knee injections in the recent past. Furthermore, Dr. Salpietro noted that the claimant had evidence of patellofemoral crepitus bilaterally, more prominent on the left than on the right. Additionally, Dr. Salpietro noted that she had small effusions in the bilateral knees and mild tenderness over the left troch bursa in the hip. However, Dr. Salpietro found that she maintained a normal range of motion in the left hip and ordered x-rays of the left hip. The results of the x-rays revealed a well-maintained acetabular joint space, with no significant evidence of arthralgias or other pathologies. (Id., p. 25). Dr. Salpietro then obtained x-rays of the claimant's bilateral knees, which revealed advanced patellofemoral arthritis bilaterally, more prominent on the left than the right, with fairly well maintained tibiofemoral joint spaces. (Id., p. 25). Following the assessment, Dr. Salpietro provided the claimant with a Depo-Medrol shot and recommended follow up monitoring. (Id., p. 26).

Then, in November 2017, the record reflects that the claimant was referred by her family physician to the Mercy St. Luke's Hospital for updated x-rays of the right

shoulder due to complaints of ongoing pains. (Ex. 7F, p. 1). The results of the shoulder x-rays revealed some inferiorly hooked or spurred acromion that could relate to underlying impingement physiology on the rotator cuff. However, the images showed that she had no evidence of superior migration of the humeral head, nor any evidence of periosteal reaction or soft tissue calcification in the shoulder joint. (Id., p. 1). She was then continued on maintenance medications; however, records from the hospital show that she returned to the emergency room on December 8, 2017, with complaints of increased pain on the right side. (Id., p. 245). Following a preliminary assessment, she was noted to have increased pain with movement, particularly while cooking. (Id., p. 246). She was then given a comprehensive physical examination, which showed increased pain with abduction and internal rotation. Additionally, the claimant was found to have some swelling over the right shoulder. She was then placed on Percocet for her right shoulder pains and was recommended to follow up with her primary care physician. (Id., p. 247).

Although there is some gap in the medical records, the treatment notes show that the claimant was re-evaluated at Westside Orthopedics again in December 2017 for complaints of her bilateral knee pains. (Ex. 8F, p. 24). Following the assessment, she was referred for MRI scans of the bilateral knees and was recommended to attempt home exercises. (Id., p. 24). However, prior to the MRI scans the record reflects that the claimant requested a re-evaluation at Westside Orthopedics for complaints of her ongoing right shoulder pains. (Id., p. 22). Upon examination, she was noted to have positive signs of impingement in the right shoulder; however, she was also noted to have well preserved cuff contraction in the right shoulder. (Id., p. 22). She was then provided with an injection in the right shoulder and was recommended for updated MRI scans of the right knee. (Id., p. 22-23). The claimant was also recommended for viscosupplmentation injections in the bilateral knees, which took place on January 16, 2018, January 23, 2018, and on January 30, 2018. (Id., p. 18, 20, and 21). The results of the MRI scans showed chondromalacia in the medial aspect of the patellofemoral compartments consistent with her history of progressive osteoarthritis in the knees. (Ex. 7F, p. 191-192). Additional MRI scans of the claimant's right shoulder also revealed a small, complete supraspinatus tendon tear in the shoulder, with moderate impingement secondary to AC joint hypertrophy and hooked acromion. (Id., p. 190). She was then referred for physical therapy services, which she received on an outpatient basis at Heartland Rehabilitation Services from February 2018 through June 2018. (Ex. 5F).

Then, on February 15, 2018, the treatment notes show that the claimant was re-evaluated at Westside Orthopedics to evaluate the effectiveness of the viscosupplmentation injections in the bilateral knees. (Ex. 8F, p. 16). During the subsequent clinical interview and physical examination, she was noted to have some complaints increased pains in the bilateral knees, as well as some evidence swelling. Additionally, the treatment notes show that she was found to have some limitations in flexion and extension secondary to pain in the bilateral lower

4

extremities. For treatment, she was recommended to continue in physical therapy services and was provided with additional cortisone injections in the knees. The claimant was also recommended to wait approximately four weeks to evaluate the effectiveness of the combined injections. (Id., p. 16-17). A review of progress reports from March 2018 show that she continued to report moderate symptoms of pain in the knees. Furthermore, the treatment notes show that she was found to have difficulties with walking. (Id., p. 14). She was then given a comprehensive examination, which revealed a valgus deformity in the knees. However, the records show that despite her complaints of pain, she was able to fully and actively extend and flex the lower extremities through 120 degrees. The treatment notes also show that she maintained normal sensations and motor strength in the bilateral lower extremities. (Id., p. 14). For treatment, she was provided with additional viscosupplmentation and cortisone injections in the knees, and was recommended to continue in physical therapy. (Id., p. 15). A review of records from physical therapy services show that the claimant reported some benefits from the cortisone injections in the knees, albeit providing only limited relief. (Ex. 5F, p. 9).

The undersigned notes that in March 2018, the claimant was referred for right shoulder surgery to repair the rotator cuff tear. (Ex. 5F, p. 9). Although comprehensive records from the surgical intervention were not provided for consideration in this appeal, post-operative treatment notes from Westside Orthopedics show that she had no evidence of infections. (Ex. 8F, p. 13). She was then referred for physical therapy services for the right rotator cuff repair, and was recommended to follow up after four weeks of physical therapy. (*Id*., p. 13). Upon reexamination in April 2018, the claimant was noted to have an increased range of motion in the right upper extremity and could easily hold her upper extremity against gravity and resistance without significant increases in pain. (*Id.*, p. 12). She was then recommended to continue in therapy services and was recommended to follow up in May 2018. Upon re-examination in May 2018, she was noted to have continued improvements in range of motion secondary to physical therapy. (*Id*., p. 11). However, the treatment notes show that she continued to report symptoms of pain, for which she was started on Neurontin as part of her treatment regimen. (*Id.*, p. 11). The undersigned notes that in June 2018, Dr. Salpietro released the claimant to return to work without restrictions in the upper extremities. (*Id.*, p. 10).

Although the treatment notes show that the claimant's right shoulder was significantly improved following surgery and physical therapy, records from Dr. Salpietro's office show that she continued to report pain and difficulties with ambulating. (Ex. 8F, p. 10). Specifically, treatment notes from Westside Orthopedics show that in June 2018, the claimant was prescribed a knee sleeve to aid with support and stability. (*Id*., p. 10). Additionally, records from July 2018 show that she was provided with additional steroid injections in the knees. (*Id.*, p. 9). However, the medical records show that the claimant reported some benefit from her medication regimen and the undersigned notes that a sedentary

5

exertional level would accommodate for residual limitations in the knees.

In September 2018, the claimant was re-evaluated at Westside Orthopedics as part of her continuum of care and for a re-evaluation of her shoulders and knees. (Ex. 8F, p. 7-8). Upon examination, she was noted to have some residual limitations in range of motion in the shoulders, as well as some swelling in the right knee. However, the treatment notes also show that despite her impairments, the claimant reported working at Honey Baked Ham wrapping pallets and described her work as involving "a lot of overhead movements while she is working." (Id., p. 7). Furthermore, the treatment notes show that she continued to report some benefit from the epidural steroid injections in the knees, which she was provided additional injections. (Id., p. 7-8). In fact, the treatment notes show that it was not until October 2018 that the claimant elected for knee replacement surgery. (Id., p. 5). Medical records from the Mercy St. Luke's Hospital show that the claimant underwent right total knee replacement surgery on November 7, 2018. (Ex. 7F, p. 102-104).

Following the claimant's right total knee replacement surgery, the record reflects that the claimant was re-evaluated at Westside Orthopedics as part of her continuum of care. (Ex. 8F, p. 3). Upon re-examination, she was noted to have some difficulties with residual pain; however, the treatment notes show that she was advancing in post-operative physical therapy. Additionally, the treatment notes show that she was ambulatory with the aid of a four-wheeled walker. The treatment notes also show that the claimant had no complaints of shoulder pains. (Id., p. 3-4). She was then continued on pain medications and was referred for updated imagery of the knees. The claimant was also recommended to continue in outpatient physical therapy. (Id, p. 3-4).

The undersigned notes that in February 2019, Dr. Salpietro opined that the claimant would be an excellent candidate for disability based upon her ongoing complaints of knee pains. (Ex. 10F, p. 1). Although the opinion of an attending physician is always given significant consideration in a determination of disability, the undersigned notes that the opinion of Dr. Salpietro fails to take into consideration the claimant's residual upper extremity functions or even address her response to treatments, including a planned left total knee replacement surgery. Because the opinion of Dr. Salpietro fail to address the whole person and/or provided a comprehensive assessment of her total residual functional capacities, the undersigned finds his opinions to be unpersuasive.

In March 2019, the record reflects that the claimant continued in physical therapy services at the St. Luke's Hospital as part of her recovery from right total knee replacement surgery. (Ex. 17F, p. 98-104). Although the treatment notes show that she continued to report pain and stiffness in the right knee following surgery, the records also show that she continued to make progress in physical therapy. (Ex. 15F and 18F). Furthermore, the treatment notes show that in June 2019, the claimant was ready to undergo left total knee replacement surgery. (Ex. 16F, p.

6

50).

Following the procedure on the claimant's left knee, the record reflects that she developed some arthrofibrosis in the left knee. (Ex. 16F, p. 54). For treatment, she was referred for manipulation in the left knee under anesthesia, which occurred in August 2019. (Id., p. 54). Additionally, treatment notes from Westside Orthopedics show that the claimant developed some residual pains in the bilateral shoulders, for which she was referred for updated MRI scans. (Ex. 16F, p. 43-46). However, the updated images of the bilateral shoulders showed that the claimant had no evidence of recurring rotator cuff tear in the right shoulder, and only demonstrated mild evidence of residual tendonitis. (Id., p. 45). Furthermore, images of the left shoulder showed only mild evidence of tendinosis in the supraspinatus tendon and mild AC joint osteoarthrosis, but no evidence of tears in any of the tendons. (Id., p. 43). She was then continued in physical therapy services and outpatient pain management at Westside Orthopedics, which has been ongoing through 2019. (Ex. 18F). A review of records from November 2019 show that the claimant has continued to demonstrate difficulties with left knee extension; however, these limitations have been accounted for in the above listed residual functional capacity. (Id., p. 6).

(ECF No. 13, PageID #: 102-105).

## C. Relevant Opinion Evidence

### i. State Agency Reviewing Physicians

On December 17, 2018, Dr. Bradley J. Lewis opined that Claimant could carry and/or lift up to twenty pounds occasionally and up to ten pounds frequently, stand and/or walk up to six hours in an eight-hour workday, sit up to six hours in and eight-hour workday, and that she was limited in her right lower extremities in that she could frequently push/pull. (ECF No. 13, PageID #: 179). Dr. Lewis also opined that Claimant could frequently climb ramps/stairs, occasionally climb ladders/ropes/scaffolds, and occasionally kneel, crouch, and crawl. (ECF No. 13, PageID #: 179-180). Dr. Lewis opined that Claimant was limited to frequent right overhead reaching. (ECF No. 13, PageID #: 180).

On reconsideration, on April 3, 2019, Dr. Mehr Siddiqui again opined that Claimant could carry and/or lift up to twenty pounds occasionally and up to ten pounds frequently.

7

However, Dr. Siddiqui further limited Claimant to standing and/or walking to four hours out of an eight-hour workday. Dr. Siddiqui agreed with Dr. Lewis on the remainder of Claimant's exertional limitations. However, Dr. Siddiqui further limited Claimant's postural limitations to occasionally climbing ramps/stairs, never climbing ladders/ropes/scaffolds, frequent balancing, and occasional stooping, kneeling, crouching, and crawling. Dr. Siddiqui agreed with Dr. Lewis on Claimant's limitation to frequent overhead reaching with her right upper extremity. Dr. Siddiqui also included an environmental limitation that Claimant avoid all exposure to hazards such as unprotected heights and heavy machinery. (ECF No. 13, PageID #: 208-209). Dr. Siddiqui noted that Claimant would have left total knee replacement in the near future, Claimant used a cane for ambulation, and that she was expected to improve with continued treatment and the impending left knee surgery. (ECF No. 13, PageID #: 209). Additionally, Dr. Siddiqui noted that the "totality of evidence in file supports sedentary RFC, light RFC of initial is not supported." (ECF No. 13, PageID #: 209).

### ii. Treating Physician – Dr. Benjamin Salpietro

On February 5, 2019, Claimant's treating physician opined that "because of [Claimant's] age and the severity of her underlying arthritis she really is an excellent candidate for disability her knee has not responded in terms of overall function as well as expected because of continuing pain and stiffness and she [at] some point will need her left knee replaced as well." (ECF No. 13, PageID #: 897).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: osteoarthritis, bilateral knees; status-post right knee arthroplasty; status-post left knee arthroplasty; rotator cuff tear, right shoulder and mild tendinosis of the bilateral shoulders; status-post shoulder surgery (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; occasionally exercise foot controls with the bilateral lower extremities; frequently reach overhead with the bilateral upper extremities; and, frequently reach in all directions with the left upper extremity. She requires an assistive device (cane) to ambulate and requires the ability to shift from sitting to standing every thirty minutes for one to two minutes in the immediate vicinity of the workstation. Finally, she should never be exposed to hazards such as moving machinery and unprotected heights.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises three issues on appeal: 1. Whether the ALJ relied on stale opinions of the State Agency medical consultants and inserted her own lay medical opinion thereby arriving at an RFC that is not supported by substantial evidence; 2. Whether the ALJ's determination at Step Three that Claimant did not meet or medically equal Listing 1.02 is supported by substantial evidence as the ALJ did not evaluate the listing; and 3. Whether Claimant's disability determination was governed by an agency structure that violates the President's constitutional power to appoint and remove executive officers.

For the reasons set forth below, the Court finds that the RFC is not supported by substantial evidence. Because remand is necessary for the ALJ to further develop the record under 20 CFR § 404.1545(a)(3), the Court expresses no opinion on Claimant's remaining two issues.

In her first issue, Claimant argues that the ALJ had only outdated expert opinions and, thus, inserted her own lay medical opinion to interpret the medical evidence and formulate the RFC. In support of this argument, Claimant relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008) and its progeny. (*See* ECF No. 15 at 11). The Commissioner argues that the ALJ properly considered the medical opinions and the medical evidence that came after those opinions. Additionally, the Commissioner argues that *Deskin* does not apply here since: 1) the ALJ had two medical source opinions to rely on here; 2) the ALJ's RFC was more restrictive than the medical source opinions; 3) the ALJ did not ignore specific functional limitations included in the medical source opinions; and 4) the evidence following the medical source opinions did not include "extensive MRI findings" that required the translation of raw medical data into functional limitations. (ECF No. 16-1 at 24-25). Finally, the Commissioner argues that the Court need not apply *Deskin* as it has been "regularly criticized by other judges in this District". (ECF No. 16-1 at 25).

The *Deskin* court set forth the following rule:

> ...[when] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases [in which] the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

605 F. Supp. 2d at 912 (quotation marks and citation omitted). After some criticism from other district courts in the Sixth Circuit, the *Deskin* court clarified its decision. *See Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011). *Kizys* clarified that *Deskin* potentially applies in only two circumstances: 1) when an ALJ made an RFC determination based on no medical source opinion; or 2) when an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *See Kizys*, 2011 WL 5024866, at *2; *see also Raber v. Comm'r of Soc. Sec.*, No. 4:12-cv-97, 2013 WL 1284312, at *15 (N.D. Ohio Mar. 27, 2013) (explaining post-*Deskin* application of the rule). Although not controlling, some courts have found that "[g]iven the persuasive authority of *Deskin* and the decade-plus of cases that have applied the *Deskin* 'rule,' … in some circumstances, an ALJ is required to obtain a medical opinion in furtherance of his 20 CFR § 404.1545(a)(3) responsibility to develop the record." *Falkosky*, 2020 WL 5423967, at *6.

This particular Court has had the opportunity to visit *Deskin* and its progeny on three prior occasions. In *Schwartz v. Comm'r of Soc. Sec.*, the claimant argued that because the ALJ gave little weight to each medical opinion, the ALJ was left with no opinions to refer to in crafting the RFC. No. 3:20-CV-01097-JJH, 2021 WL 3566585, at *13 (N.D. Ohio June 30,

12

2021) (citing *Deskin*, 605 F. Supp. 2d at 912), *report and recommendation adopted in part, rejected in part sub nom. Schwartz v. Comm'r of Soc. Sec.*, No. 3:20-CV-1014, 2021 WL 3149095 (N.D. Ohio July 27, 2021). This Court found that *Deskin* did not apply since the ALJ sufficiently weighed the opinions at issue and had "considered the record as a whole" including the opinions of claimant's nurse practitioner and primary care provider and the state agency reviewing physicians when crafting the RFC. *Id.* Similarly, in *Berrier v. Comm'r of Soc. Sec.*, this Court stated that it "need not decide whether to adopt *Deskin* as clarified in *Kizys* because the instant case falls outside the 'narrow rule' set forth in those decisions." No. 3:20-CV-01655-JZ, 2021 WL 6881246, at *7 (N.D. Ohio Sept. 10, 2021), *report and recommendation adopted*, No. 3:20 CV 1655, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022). This Court explained that "Claimant has not demonstrated that the RFC is flawed because of a 'critical body of objective medical evidence' post-dating the medical source opinions considered by the ALJ. Additionally, unlike the two years of medical treatment in *Deskin*, only five months of medical evidence followed the final state agency review of Claimant's medical records." *Id*. Most recently, in *Fergus v. Comm'r of Soc. Sec.*, this Court applied the *Deskin* rule and remanded the matter despite having three medical opinions on plaintiff's functional abilities "[b]ecause the ALJ had no medical opinions on the [plaintiff's] functional abilities for the majority of the period of disability at issue – four out of the five years examined by the ALJ, and because the ALJ's RFC finding was based on the ALJ's lay conclusion concerning [p]laintiff's reported symptoms and diagnostic testing[.]" No. 5:20-CV-02612-CEH, 2022 WL 743487, at *12 (N.D. Ohio Mar. 11, 2022).

As an initial matter, the Court recognizes that an ALJ is not required to base her RFC on any one medical opinion. *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th

13

Cir. 2018) (holding that the ALJ was not required to obtain an opinion from another physician after assigning no weight to a medical opinion in the record); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (reasoning that requiring the "ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled' "). Indeed, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion." *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4, 2018) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)). However, the Court agrees that in some circumstances, an ALJ is required to obtain a medical opinion in furtherance of her 20 CFR § 404.1545(a)(3) responsibility to develop the record. *See Harper v. Comm'r of Soc. Sec.*, No. 1:20-CV-1304, 2021 WL 2383833, at *14 (N.D. Ohio May 25, 2021), *report and recommendation adopted*, No. 1:20-CV-1304, 2021 WL 2381906 (N.D. Ohio June 10, 2021). Such a circumstance exists where the medical evidence requires the ALJ to make medical judgments of a claimant's functional abilities by interpreting raw medical data. *See Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021) ("Courts are generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data."); *see Mascaro v. Colvin*, No. 1:16CV0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) (noting neither the ALJ nor the court had the medical

14

expertise to conclude whether the results of a neurological exam necessarily ruled out the existence of a disabling condition). Also, a medical opinion is necessary "where a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions." *McCauley v. Comm'r of Soc. Sec.*, No. 3:20-CV-13069, 2021 WL 5871527, at *14–15 (E.D. Mich. Nov. 17, 2021), *report and recommendation adopted*, No. 20-CV-13069, 2021 WL 5867347 (E.D. Mich. Dec. 10, 2021) (citing *Branscum v. Berryhill*, No. 6:17-CV-345, 2019 WL 475013, at *11 (E.D. Ky. Feb. 6, 2019)). At such times, "the ALJ should develop the record by obtaining opinion evidence that accounts for the entire relevant period." *Id.*

Here, seven months of medical evidence, from April 3, 2019 to November 27, 2019, followed the final state agency review of Claimant's medical records. If length of time were the only consideration, the analysis could likely end here. *See Jackson v. Comm'r of Soc. Sec. Admin.*, No. 4:13-CV-929, 2014 WL 2442211, at *7-8 (N.D. Ohio May 30, 2014) (distinguishing *Deskin* on the grounds that less than one year of medical evidence followed the final state agency review of claimant's medical records, the evidence showed some improvement, and the ALJ had assigned significant weight to the opinion of the state agency consultants); *Raber*, 2013 WL 1284312 at * 17 (distinguishing *Deskin* because "the evidence related to [Raber's] condition after the consultative review covered roughly eleven months and showed she was reporting improvement or relief through treatment and did not want surgery."). However, the Court must also consider the substance of the medical evidence covered during those seven months and determine whether it was the type of medical evidence that required a medical opinion " 'to enable the administrative law judge to make the disability decision.' " *Jackson*, 2014 WL 2442211, at *9 (quoting *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th

15

Cir. 1986) (citation omitted))

From April 3, 2019 to November 27, 2019, Claimant continued to treat for her left knee and shoulder impairments. On April 23, 2019, an X-ray of Claimant's left knee showed advanced arthritis, most severe in the patellofemoral joint. (ECF No. 13, PageID #: 957). On June 17, 2019, Claimant underwent a total left knee arthroplasty. (ECF No. 13, PageID #: 10921093). On July 5, 2019, Claimant went to the emergency room complaining of increased pain in her left knee. Swelling of the knee was noted. (ECF No. 13, PageID #: 1063). Three X-rays of the knee showed no evidence of hardware complication. It was also noted that the "left knee [was] diffusely tender" and that "[a]nterior soft tissue edema is again present." (ECF No. 13, PageID #: 1066). Claimant was prescribed a muscle relaxant and told to follow up with her orthopedic surgeon. (ECF No. 13, PageID #: 1066). Claimant followed up with Dr. Salpietro on July 9, 2019. (ECF No. 13, PageID #: 1203). Dr. Salpietro noted some swelling in her knee but determined that no change in her post-operative treatment was needed at that time. (ECF No. 13, PageID #: 1203).

Claimant followed up with Lorrie A. Elchert, NP, on July 18, 2019, one-month post-left knee total knee replacement. (ECF No. 13, PageID #: 938). She used a walker, was still in significant pain, and was attending therapy three times per week. (ECF No. 13, PageID #: 939). Her left leg remained moderately swollen. (ECF No. 13, PageID #: 939-940).

At her next post-surgical follow-up with Dr. Salpietro, on July 30, 2019, Dr. Salpietro noted that Claimant had a "fair amount of pain and stiffness" in her left knee, that she lacked some extension, and that her active flexion was about 95. (ECF No. 13, PageID #: 1201). Dr. Salpietro examined Claimant on August 20, 2019, after Claintiff's therapist suggested that she needed a closed knee manipulation. (ECF No. 13, PageID #: 1198). Dr. Salpietro observed a

nicely healed incision, although the knee was stiff, and she lacked about 30 degrees of extension. (ECF No. 13, PageID #: 1198). Claimant underwent this closed manipulation procedure under anesthesia on August 26, 2019. (ECF No. 13, PageID #: 1197).

Claimant underwent a course of physical therapy under Mary Sims, PT, beginning after her left total knee replacement procedure. (ECF No. 13, PageID #: 1008-1049, 1094-1180). At the last appointment, September 12, 2019, it was noted that Claimant continued to report stiffness and an inability to straighten the left knee with increasing pain levels reaching 9/10. (ECF No. 13, PageID #: 959). PT Sims observed significant tightness in the popliteus posterior knee area, tightness in the capsular region, and +1 pitting edema in the left lower leg. (ECF No. 13, PageID #: 960). Claimant also continued to exhibit ambulation deficits, functioning limited by pain, range of motion deficits, strength deficits, and muscle weakness. (ECF No. 13, PageID #: 962).

Claimant saw Dr. Salpietro on September 17, 2019, where he noted a progressive decline in motion even after the closed manipulation procedure. (ECF No. 13, PageID #: 1194). Claimant was unable to straighten the knee completely and was limited to about 95 degrees of flexion. (ECF No. 13, PageID #: 1194). During her October 8, 2019 follow up with Dr. Salpietro, he noted that she had developed arthrofibrosis in her left knee following the surgery and that although he got "excellent movement in all planes[,]" she still lacked about 15%. (ECF No. 13, PageID #: 1191). Dr. Salpietro ordered her a dynamic extension knee brace. (ECF No. 13, PageID #: 1191). On October 31, 2019, Claimant returned Dr. Salpietro regarding her left knee. (ECF No. 13, PageID #: 1188). Dr. Salpietro noted that he had ordered her a dynamic extension brace, but the order was denied by her insurance company. (ECF No. 13, PageID #: 1188). Claimant continued to have "significant flexion contracture at least 13-15 degrees[,]" which Dr.

Salpietro notes was documented in therapy as well. (ECF No. 13, PageID #: 1188). Dr. Salpietro noted "I believe it is imperative that we obtain a dynamic extension split to maximize her recovery[.] [I] will have the office contact the insurance company to try and obtain the proper [coding] to make this [available] in her recovery it is my opinion that denial of this device will hamper her recovery and long-term function of the knee." (ECF No. 13, PageID #: 1188). Claimant returned to Dr. Salpietro on November 5, 2019. (ECF No. 13, PageID #: 1187). Dr. Salpietro commented that Claimant's insurance provider had on multiple occasions denied her getting the recommended dynamic extension splint and that this was "in no uncertain terms" a detriment of her recovery. (ECF No. 13, PageID #: 1187). Because of this, Dr. Salpietro recommended that Claimant continue physical therapy. (ECF No. 13, PageID #: 1187).

The records also show Claimant treated after April 3, 2019 for her shoulder impairments. On June 11, 2019, Claimant treated with Dr. Salpietro for bilateral shoulder pain, for which he diagnosed her with rotator cuff tears in both shoulders and recommended MRI scans of both. (ECF No. 13, PageID #: 955). Claimant had an MRI scans taken of both shoulders on August 8, 2019. (ECF No. 13, PageID #: 1081-1082). The MRI of her left shoulder showed mild tendinosis of the supraspinatus, mild thickening and edema of the subacromial and subdeltoid bursa, and some trace fluid in the bursa. (ECF No. 13, PageID #: 1081). The MRI of the right shoulder revealed mild tendinosis of the supraspinatus tendon and fluid in subacromial and substantive bursa. (ECF No. 13, PageID #: 1082). No functional limitation opinions were provided after the April 3, 2019 opinion from the State Agency reviewing physician.

Although the decision details the records regarding Claimant's post-opinion shoulder pain, the ALJ summarizes very little of Claimant's treatments for her left knee after April 3, 2019. (ECF No. 13, PageID #: 105 ("the treatment notes show that in June 2019, the claimant

18

was ready to undergo left total knee replacement surgery. (Ex. 16F, p. 50). Following the procedure on the claimant's left knee, the record reflects that she developed some arthrofibrosis in the left knee. (Ex. 16F, p. 54). For treatment, she was referred for manipulation in the left knee under anesthesia, which occurred in August 2019. (Id., p. 54).")). Later, the ALJ recognized that the "records [ ] show that the claimant has continued to demonstrate difficulties with left knee extension" and stated that "these limitations have been accounted for in the above listed residual functional capacity." (ECF No. 13, PageID #: 105).

The Court finds that although the period of medical evidence between the last functional opinion and the ALJ's opinion was only seven months, applying the *Deskin* rule here makes sense. A review of the medical records shows that there is a "critical body" of the "objective medical evidence" that is not accounted for by a medical opinion. *See Kizys*, 2011 WL 5024866, at *2. This is not a case such as in *Jackson* or *Raber* where the claimants each showed improvement following the final functional opinion. Here, the body of evidence clearly indicates that despite having the left total knee replacement, Claimant showed continuing objective signs of functional limitations in her lower extremities. The ALJ's assessment of the medical opinions also supports the need for a fresh medical opinion that considers the Claimant's functional abilities following her left knee surgery. The ALJ found the opinions of Drs. Lewis and Siddiqui "generally persuasive" and based the RFC, at least in part, on these medical source opinions, which did not consider Claimant's demonstrated functional limitations following her total left knee replacement. Dr. Siddiqui opined that Claimant was limited to sedentary work (with additional limitations) and explained that Claimant would have a "[l]eft TKA in near future, not scheduled yet. currently using cane for ambulation. Expected to improve with continued treatment and left TKA." (ECF No. 13, PageID #: 209). Yet, the objective medical evidence

shows that she still suffered significant limitations following her surgery. In February 2019, Dr. Salpietro opined that the Claimant would be an excellent candidate for disability based upon her ongoing complaints of knee pains. (Ex. 10F, p. 1). The ALJ noted that "[a]lthough the opinion of an attending physician is always given significant consideration in a determination of disability, …the opinion of Dr. Salpietro fails to…even address her response to treatments, including a planned left total knee replacement surgery." (ECF No. 13, PageID #: 105). However, this "planned left total knee replacement surgery" does not appear to have provided the expected relief through the date of the decision.

Accordingly, the Court finds that the ALJ erred by failing to further develop the record under 20 CFR § 404.1545(a)(3). Consequently, her RFC finding was not supported by substantial evidence.

## VI. Conclusion

Based on the foregoing, it the Court REVERSES the Commissioner of Social Security's nondisability finding and REMANDS this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

Dated: March 18, 2022

                                                         s/ *Carmen E. Henderson*
                                                        CARMEN E. HENDERSON
                                                        U.S. MAGISTRATE JUDGE